Thank you, Your Honor. Good morning, Your Honors. I am Thomas Roach, appearing on behalf of Appellant Debra Shirley. This is a Social Security disability case. Ms. Shirley worked for the County of San Diego as an eligibility technician for 18 years. After suffering with pain in her thumbs for over 10 years, she finally had to stop working and subsequently had two carpal tunnel surgeries. After the carpal tunnel surgeries, she did not obtain all the relief she had hoped for, but continued to have pain and swelling in her upper extremities and pain in her neck. She was eventually diagnosed with myofascial pain syndrome and a depression secondary to her medical conditions. The ALJ, after the hearing in his decision, found that she only had the residuals of the carpal tunnel surgery. He did not make any findings regarding the myofascial pain syndrome, and he found that the depression secondary to the medical condition was a non-severe impairment. He did find that she couldn't go back to her past relevant work, but found that there was other work that she could do. In reaching this conclusion, he discounted her complaints of pain and gave a series of reasons, but these series of reasons didn't identify what complaints it was that he wasn't finding credible. In fact, there's no way of telling from his list of reasons whether he's talking about carpal tunnel syndrome or whether he's talking about myofascial pain syndrome. So, from that point of view, there's no way of knowing whether or not those are clear and convincing reasons in light of the fact that he doesn't identify what impairment that he's talking about. Does any doctor say she's disabled? Her treating doctor, Dr. Cage, who did the two surgeries, did find her temporarily totally disabled under the workman's comp system, but no doctor was specifically asked in terms of Social Security whether she was disabled or not, and Social Security doesn't consider a doctor's opinion as a person's disability to be of any controlling weight because they say that's an issue reserved to the commissioner because it's a medical and a vocational determination and not a straight medical determination. But usually in these cases, we do find some expert saying the individual is disabled. In this case, the only one we do have, Your Honor, is Dr. Cage with her temporary total disability. They found that she didn't have fibromyalgia, and you concur in that. That's correct. And they said there was no neuropathy. Correct, no neuropathy. There was a concern that there might be a neuropathy because she was complaining about pain in her neck, and so they thought it might be located in the spine and causing the pain to radiate, but they found that that wasn't the case, and both Dr. Strouser, who she was referred to by her surgeon, and Dr. Cage, her surgeon, concluded that she had myofascial pain.  No, Your Honor. There was a short period of time when she wasn't taking any medication. She was taking pain medication, but she developed some complications. In particular, she developed problems with her ear, and for a period of time, she was taken off the medication. At the time of the hearing, she hadn't been back to see Dr. Cage yet and had only been to urgent care. Urgent care had prescribed her new medication, but because of the complications with her medication, she was reluctant to take it until she actually saw her treating doctor. So it was only for a short period of time that she was off pain medications. I think one of the really important things in this case is the fact that the judge effectively accepted the fact that she had a depression secondary to her medical condition and that she had a global assessment of functioning of 60, but then came to the conclusion that her mental impairment was not severe. Well, a global assessment of functioning of 60 is a person who has moderate impairments in social and occupational functioning. The judge, without explanation, came to the conclusion that she only had mild impairments, even though he did accept the fact that she had the global assessment of 60. He gave no explanation of that. He seemed to think it significant that she seemed to be able to perform quite a few household functions and drive her children around to soccer practice and that kind of thing. He did, Your Honor, and he gave her a significant amount of trouble in the hearing about those not doing a significant amount of activity. She was getting help with almost everything she did. The driving she did, she drove one child to school, but didn't drive them home. So there's no evidence that this is activity that's either consistent with her ability to do light work, which is what the ALJ found, or even inconsistent with her testimony. There was no testimony as far as how far she drove her daughter to school, but even if you did it once a day, that's not inconsistent with her complaints, and it's certainly not consistent with the ability to do light work, which would be 40 hours a week. I'd like to reserve the rest of my time for rebuttal. Your Honor, it's John Karvelas for the NAPOLE, Joanne Barnhart, the Commissioner of Social Security. Basically we've got three impairments here. One is a carpal tunnel syndrome, which was alleviated by surgery, and Dr. Cage did say she was temporarily totally disabled, but there is a less than 12-month time period in which he applied that opinion. Therefore, that is not an opinion of disability under the Social Security Act, because Section 223 of the Social Security Act indicates that disability means an inability to engage in substantial gainful activity for at least 12 consecutive months. So his opinion doesn't meet the threshold of disability, even though he uses that word. So the carpal tunnel syndrome is significantly alleviated within 12 months. Then we have the myofascial pain syndrome, in which no treating source has ascribed any limitations to the appellant. She does have it. Yes, I would concede that she does have it. Yes, Your Honor. In respect to that, our cases seem to say that we must credit the complainant's report of pain, even though it's access to what one might expect from the other medical, if there is an underlying medical problem. Yes, unless it's properly discounted by the ALJ, and that's where counsel and I disagree. I would submit that the ALJ did properly discount her assertions of disabling pain. Now, exactly how did he do that? Well, he has his list of reasons, and the one I'd like to focus on is explicitly the daily activities. If someone has a significant upper body impairment, and perhaps I'm making too much of this, it's doubtful, or it's a reasonable inference that it's doubtful that someone in significant pain from that impairment would be driving their child to school. Driving the child to school, even if it's a short distance, every day, requires an alertness. Was it every day? The statement by the daughter suggests that it was every day. There's a written statement by her which would indicate that. And so we have no limitations arising, medical limitations, ascribed from the myofascial pain syndrome. And then we have a diagnosis, excuse me, a GAF of 60 made by a social worker concerning the claimant's depression. The ALJ said, at most, he didn't adopt that wholeheartedly. And this is one of those in which, if I were to brief this today rather than several years ago, there would be pages and pages of exposition on what a GAF means. But basically, it's a snapshot. Even if it's by a doctor, it's a snapshot of an impairment rather than a longitudinal indication of an impairment. It's done by a social worker, so it's not medical evidence. It's a snapshot, so it doesn't meet the duration requirement. And it has access for factors, which in this case were, I believe, economic. So it's not simply a medical assessment, the GAF of 60. And 60 is right on the cusp between moderate and mild. What kinds of things do they test in that? Well, Your Honor, looking at the mental status exam, this seems to be, the social worker's assessment seems to be predicated primarily upon the plaintiff's symptoms. I mean, she didn't appear to be abnormal. In the pages or two of the record leading up to that. Well, I wasn't being quite so specific. I just wondered, when they do that test, what things do they look at? Oh, okay. Your Honor, I'm not quite sure it's a test. I think it's a guess or an assessment or an estimate. And they look at certainly their interaction with the person and the person's symptoms. What do they say their problem is? Then they take a history. So they've got a history. They've got their observations of the person. They've got the person's statements as to what their problems are. And then they've got some idea of the person's life situation, which would come in on Axis 4. And that may be legal systems, family problems, economic problems. So there's a huge mix of things that go into a GAF assessment. And there's a Federal Register site that indicates that Social Security, for these reasons, does not adopt a GAF as an estimate of severity. And here, of course, you have a GAF of 60 leading apparently to group therapy. And there is no real evidence in the file of this group therapy. And apparently shortly before the hearing, the claimant missed several sessions of the group therapy. So I would submit that that conservative treatment, even if the GAF were made by a physician or a psychologist or a psychiatrist as opposed to a social worker, would not indicate the presence of severe mental impairment, especially when combined with her daily activities. So I think we have three impairments, one of which was temporarily disabling, and the other two were not. And I think the ALJ took her impairments into account when he imposed the restrictions that he did upon the vocational expert. He cut down her manipulative abilities and he did not say she could do a high-stress job and so on. And I think that the ALJ did consider that. And so... You seem, at least the counsel for Ms. Shirley, seems to think he overrated the amount of her daily activities. He picked on the fact she did her laundry, but the daughter suggests that, well, yes, she may have put a load in, but she always had help and all of that. She had responsibility for meals and the like. On the full exposition between Ms. Shirley and her daughter, it sounded as if those responsibilities were titular and then in practice were shared substantially. Your Honor, that may well be the case. And so he's not saying that she can do a full range of light work. And I submit that that's almost in every one of these cases. Whenever you have a daily activity indicated by a claimant, they then say, well, that's on a good day or that's with help and so on. But you have a variety here, including shopping, getting children ready for school, doing some component of laundry, doing some simple cooking, which I think is substantial evidence for the ALJ's conclusion that she had the somewhat limited residual functional capacity that he found she had. I wondered about this laundry and dishwasher. We all have washing machines and dishwashers. And even if I've got a temperature of 105, I can toss those things in. Your Honor, I can't dispute your assertion. I would say in my long ago experience, getting my kid ready for school was simply yelling at him to get out of bed. Well, Your Honor, the statement by, there's no indication that that's how she got her children ready for school. And apparently there were quite a bunch of them. So certainly you can make an argument either way and counsel certainly has made an argument that is not ajar with the facts and I think the ALJ could too. And that's the ALJ's job is to sort of resolve these ambiguities. And when you throw them all into the mix, the relative lack of treatment, the lack of diagnosis or of assessments of disability, the lack of medication, I think the ALJ was justified in coming to the conclusion that he did. Okay. Thank you very much, Mr. Edwards. Thank you. I would like to just address the daily activities for a moment and point out the fact that there were five children at home and they ranged in age from nine to 18. So we're not talking about having to dress young children or anything like that. And Ms. Shirley did say that basically all she did for the youngest of them was wake him up and then assemble his lunch, that she didn't actually make his lunch, but she put together things that were already made. There is clear evidence that the only laundry she was doing was the laundry for her and her husband because the rest of the kids did their own. And she even got help in doing the laundry that she did for her and her husband. I think the important part, though, to remember in all of this, and counsel was pointing out the fact that the GAF assessment was done by a social worker, is the fact that that's irrelevant. The ALJ accepted that GAF and accepted that diagnosis. He just gave the wrong assessment of what that GAF means. It doesn't mean mild symptoms. It means moderate symptoms. And if she has moderate symptoms, then it's not a non-severe impairment. It is a severe impairment and he should have evaluated it that way. And he gave no explanation of how he came to the conclusion that it was mild when, in fact, by definition it is a moderate interference with occupational or social functioning. Thank you. Thank you, counsel. The matter just argued will be submitted and will next hear argument in Johnson. Thank you.
judges: B. Fletcher, Rymer, Fisher